## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ARCHIE D. THOMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL NO.  04-4162-GPM** |
| | ) | |
| **JACKSON COUNTY, ILLINOIS,** | ) | |
| **d/b/a Jackson County Ambulance Service,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

The Court heard arguments on Jackson County's pending motion on January 19, 2007.  For the reasons set forth on the record at the hearing and below, Defendant Jackson County is entitled to summary judgment.

### BACKGROUND

Plaintiff, an African-American, was employed as an Emergency Medical Technician Paramedic (EMT) with the Jackson County Ambulance Service.  He claims that he suffered racial discrimination in employment which led to his constructive discharge.

In Illinois, emergency medical systems are comprised of:  1) vehicle service providers, 2) hospitals, and 3) personnel.  In this case, the vehicle service provider is Jackson County Ambulance Service (JCAS), and the hospital is Memorial Hospital of Carbondale.  The relationship between these entities is governed by the Illinois Emergency Medical Services (EMS) Systems Act at 210 ILCS 50/1, et seq.

When responding to an ambulance call, EMTs must often provide emergency medical treatment such as a needle injection or an intravenous treatment (IV).  Thus, EMTs must operate under a medical license and can function only under the direction of a licensed Medical Director.  Here, the EMS Medical Director was Dr. Doolittle.  Dr. Doolittle was responsible for overseeing the medical services administered by Defendant's EMTs, including the medical services that were provided by Plaintiff.  Under Dr. Doolittle was Paula Bierman, an EMS Coordinator.  As EMS Coordinator, Ms. Bierman was responsible for overseeing compliance issues, skill deficiencies, and training of Defendant's EMTs.  Although Dr. Doolittle and Ms. Bierman were part of the same EMS system as Defendant, neither Doolittle nor Bierman were employed by Defendant.

Plaintiff began working for JCAS in October 1996.  In 2000, he expressed interest to Ms. Bierman in becoming a Supervisor.  Bierman told him that to become a Supervisor, he must first become a "Preceptor."  (A "Preceptor" is a person who mentors and monitors other EMTs).  Plaintiff then told Bierman that he wanted to become a Preceptor, and she responded that he must first obtain some teaching experience.  Plaintiff then asked Bierman for some teaching experience but she did not give him a teaching assignment.  Plaintiff did, however, receive a teaching opportunity from an instructor at John A. Logan College which Plaintiff rejected.

On September 29, 2003, Plaintiff responded to an ambulance call where a woman had lapsed into a diabetic coma.  After arrival, Plaintiff injected her with glucose and started her on an IV but failed to contact Medical Control personnel.  Applicable protocol required that anytime an EMT administers medicine or an IV, the EMT must contact Medical Control.

Plaintiff's failure to contact Medical Control was reported to Paula Bierman.  Ms. Bierman reported the incident to Dr. Doolittle and recommended that Plaintiff be suspended.  Dr. Doolittle

rejected Ms. Bierman's recommended suspension.  Instead, Dr. Doolittle placed Plaintiff on ninety (90) days of probation beginning October 6, 2003.

In mid to late October, Plaintiff applied for an open Supervisor position.  On October 28, 2003, JCAS Director Dottie Miles sat down with Plaintiff and discussed his application.  Plaintiff was not promoted to Supervisor.  On November 11, 2003, Plaintiff filed an EEOC charge of discrimination against Defendants.  In December 2003, Plaintiff took a leave of absence under the Family Medical Leave Act (FMLA) due to job stress.  When Plaintiff returned, he was informed that because he took FMLA leave in December 2003, he had interrupted the completion of his 90-day probationary period, and he still had six-weeks left on probation.  Shortly thereafter, in February 2004, Plaintiff began taking general leaves of absence on a monthly basis.  On July 7, 2004, Plaintiff resigned by sending a letter to Dottie Miles indicating that he would not return to employment.

## ANALYSIS

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  In considering a summary judgment motion, a court must review the entire record and draw all reasonable inferences in the light most favorable to the non-moving party.  *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).  In evaluating a motion for summary judgment, "[t]he court has one task and one task only:  to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

To avoid summary judgment on his discrimination claims, Plaintiff must present facts from

which a reasonable juror could find that Defendant discriminated against him because of his race. Plaintiff has sued under Title VII and 42 U.S.C. §§ 1981, 1983.  Title VII forbids certain employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his … terms, conditions, or privileges of employment, because of such individual's race, . . ."  42 U.S.C. § 2000e-2(a)(1)).  The anti-retaliation provision also forbids employers from taking an adverse employment action against an employee for opposing discrimination.  42 U.S.C. § 2000e-3(a).  The same standards apply under Title VII, § 1981, and § 1983.  *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004) (*citing Friedel v. City of Madison*, 832 F.2d 965 (7th Cir.1987)) ("When the plaintiff alleges intentional discrimination … it is clear that the same standards in general govern liability under sections 1981, 1983, and Title VII").

Upon review of the record and after hearing argument, Plaintiff's claims against JCAS cannot survive summary judgment.  Plaintiff claims that Defendant discriminated against him by creating a hostile work environment that led to his constructive discharge.  Specifically, Plaintiff claims that in 1996 he saw "KKK" scribbled on a picnic table outside Defendant's premises.  When Plaintiff complained about it, Defendant remedied the situation.  Plaintiff also complains that during the year 2000 he heard second-hand (*i.e.*, not in Plaintiff's presence) that one of Defendant's Supervisors, Gerald Lence, used the word "nigger" and allowed an EMT under his supervision, Gary Bartlo, to refer to African-Americans as "coons" and "niggers," again not in Plaintiff's presence. Plaintiff also claims that one of Defendant's Supervisors told him that some black beans in a jar were like what Plaintiff's children would look like.

To prove a "hostile work environment," the alleged harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions" of Plaintiff's employment and

"create an abusive working environment." *Whittaker v. Northern Illinois University*, 424 F.3d 640, 645 (7th Cir. 2005) (*citing Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir.2004)). "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Whittaker*, 424 F.3d at 645 (*citation omitted*). Indeed, the threshold for Plaintiff is high, as "[t]he workplace that is actionable is one that is 'hellish.'" *Id.*, (*citing Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)).

Here, most of the objectionable conduct was outside of Plaintiff's presence, and the remaining occurrences were isolated incidents that spanned several years. An objectively hostile work environment will not be found where "[m]ost of the conduct that forms the basis of [Plaintiff's] claim consists of derogatory statements made by supervisors or co-workers out of [Plaintiff's] hearing," and the rest is "isolated and not particularly severe." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (*citation omitted*); *see also Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (rejecting hostile work environment claim where most of the offensive comments giving rise to the claim were not directed at the plaintiff, and those that were directed at plaintiff were isolated).

"Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Whittaker*, 424 F.3d at 649 (*citing Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000)). Because Plaintiff has failed to show work conditions sufficiently egregious to meet the high hostile work environment standard, he cannot

meet the even higher showing required to support a constructive discharge.[1]

Plaintiff also claims that Defendant discriminated against him by failing to promote him to Supervisor and by placing him on probation.  The record is clear, however, that Plaintiff did not possess the qualifications required to become a Supervisor.  To become a Supervisor, Plaintiff must have first become a Preceptor.  To become a Preceptor, Plaintiff must have had some teaching experience.  Plaintiff did not obtain teaching experience nor did he achieve Preceptor status.  There is another reason that Plaintiff could not be promoted to Supervisor, and that is due to the fact that at the time he interviewed for the position he was on probation.

Plaintiff also bases his failure to promote claim on the fact that JCAS Supervisor Gerald Lence, whom he claims was racially biased, participated in the decision to put him on probation.  Specifically, Plaintiff claims that Gerald Lence and Ms. Bierman fed misinformation to Dr. Doolittle who placed Plaintiff on probation.  Plaintiff cites *Little v. Illinois Department of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004), for the proposition that a "formally subordinate employee should be treated as the decisionmaker where he is the real cause of the adverse employment action."

Here, however, the record is clear that Mr. Lence was not the real cause of the adverse employment action.  There is no dispute that Plaintiff violated protocol by failing to contact Medical Control.  Although Lence may have provided information regarding such violations, Ms. Bierman, as EMS Coordinator (and not an employee of Defendant), was responsible for overseeing compliance issues.  It was Ms. Bierman who recommended to Dr. Doolittle that Plaintiff be

---

[1] Plaintiff also claims that once he was placed on probation, Defendant's Supervisors had to accompany him on every ambulance call, and that rather than assist him, they merely stood by and supervised his actions.  Nothing in the record suggests that the Supervisors' failure to assist him during the probationary period was racially motivated, rather, it was Defendant's procedure that employees placed on probation be monitored by a Supervisor during emergency calls.

suspended.  As noted, however, Dr. Doolittle reduced Ms. Bierman's recommendation to probation.

Based on the record, it is clear that the decisions regarding discipline were made not by any of

Defendant's personnel but by the EMS Medical Director and/or EMS Coordinator.  Plaintiff has set

forth no evidence that Defendant had any authority to either appoint preceptors or discipline

employees for medical issues.  Indeed, Plaintiff admitted at argument that JCAS Director Dottie

Miles had nothing to do with either the decision to make Plaintiff a Preceptor or place him on

probation.  In sum, Defendant simply took no adverse employment action against Plaintiff.

Finally, Plaintiff also claims that Defendant retaliated against him for speaking out on racial

issues and for filing an EEOC charge on November 13, 2003.  Again, however, there is no evidence

that Defendant took any adverse employment action against Plaintiff.  Plaintiff makes general

allegations that after he filed his charge, the "work environment worsened" and became "more

hostile" for Plaintiff.  At argument, Plaintiff explained that what he was referring to, however, is that

after he was placed on probation, he was monitored by Supervisors who accompanied him on

emergency calls but did not assist him.  As noted, nothing in the record suggests that these

occurrences were anything more than a matter of Defendant's procedure for monitoring employees

who had been placed on probation.  Again, Defendant simply took no job action against Plaintiff.

"Failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation

claim."  *Roney v. Illinois Dept. of Transp.*, 2007 WL 117507 at *2 (7th Cir. Jan. 18, 2007) (*citing*

*Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)).

## CONCLUSION

Defendant's motion for summary judgment (Doc. 47) is **GRANTED**.  Plaintiff's claims

against Jackson County are **DISMISSED with prejudice**.  Jackson County is dismissed from this

action.  The Clerk of the Court is **DIRECTED** to enter judgment accordingly at the close of this

case.

      **IT IS SO ORDERED.**

      DATED:  1/23/2007

                                           s/ G. Patrick Murphy
                                           G. PATRICK MURPHY
                                           Chief United States District Judge